UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOYCE THOMAS,

    Plaintiff,

v.                                       Case No. 1:04-CV-847

CITY OF GRAND RAPIDS, CRAIG           HON. GORDON J. QUIST
BEGEMAN, individually, and
REFUGIO ALCALA, individually,

    Defendants.
_____/

## OPINION

Plaintiff, Joyce Thomas ("Thomas"), has sued Defendants, the City of Grand Rapids ("City"), and Grand Rapids Police Officers Craig Begeman ("Officer Begeman") and Refugio Alcala ("Officer Alcala") (collectively "Defendants"), alleging claims under 42 U.S.C. § 1983 for illegal seizure and excessive use of force in violation of the Fourth Amendment and for violation of her right to equal protection under the Fourteenth Amendment. Thomas also alleges state law claims of assault and battery, false arrest and imprisonment, gross negligence, and intentional infliction of emotional distress. The claims arise out of an investigative detention and handcuffing of Thomas by Officers Begeman and Alcala on the morning of January 3, 2003. Now before the Court is Defendants' motion for summary judgment. For the reasons stated below, the Court will deny the motion with respect to the Fourth Amendment claims but grant the motion with regard to the equal protection claim and the municipal liability claim against the City.

### I. Facts

On January 3, 2003, at approximately 8:30 a.m., Nick Delauter ("Delauter"), an employee of the Walgreens store located at 1601 Kalamazoo Avenue, S.E., in Grand Rapids, called 911 to

report an apparent theft at the store. Delauter said that while he was working behind the photo desk in the store, he observed a black male apparently stealing one or more boxes of a "stop smoking" product. Although Delauter did not see the suspect put the merchandise inside his jacket, he saw the suspect first with a box in his hand and then without a box in his hand but appearing more bulky in his jacket area. Delauter reported that when the suspect saw Delauter looking at him, he quickly walked out of the store. Delauter followed the suspect into the parking lot and saw him flee through the parking lot and head west on Dickinson Street, which runs in a southwest to northeast direction and borders Walgreens on the south side of the store. Delauter described the suspect as a black male in his 40's, approximately 5'9" tall and a little chunky, weighing between 180-200 pounds, and wearing a Red and Gold "Chiefs" jacket, blue jeans, and a gray stocking cap.

At approximately 8:43 a.m., the police department dispatch sent out a radio call regarding the reported Walgreens theft. When the call went out, Officers Alcala and Begeman and Officer Jeremy Huffman (not a defendant in this case), who were uniformed patrol officers, were at the Sam's Oasis restaurant located directly across the street from the Walgreens store. Officers Alcala and Begeman, who were riding as partners that day, responded in their patrol car, and Officer Huffman responded in his patrol car. As Officers Alcala and Begeman were heading west on Boston Street, which runs parallel to Dickinson street in a southwest to northeast direction and is located immediately to the north of the Walgreens store, a black man driving a pick-up truck approached them and asked whether they were looking for a man in a red jacket. When Officer Alcala replied "yes," the man said that he saw the suspect running "back over there" and pointed to the southwest, toward the area between Dickinson Street, on the south, and Boston Street, on the north. The officers continued down Boston Street and eventually around the block, but they did not see anyone wearing a red jacket or running.

By 8:48 a.m., Officers Alcala and Begeman had received all of the information contained in Delauter's description of the suspect and were located on the north side of Dickinson street. At about this time, Officers Alcala and Begeman saw some construction workers working on a house located near the intersection of Nelson Avenue and Dickinson. The construction workers told the officers that they had seen a "guy" in a red coat by the first house to the west of and next to Walgreens on the north side of Dickinson Street about ten minutes earlier. At that point, Officer Begeman exited the patrol car and began walking in order to check the backyards of the houses located on the north side of Dickinson Street, where the suspect might be hiding. Officer Alcala, still in the patrol car, drove to speak with the construction workers on Nelson Avenue again. The workers said that they had seen a black male wearing a red and yellow jacket crouching down near a wooden picket fence surrounding the house on Dickinson Street next to Walgreens and that after police officers arrived, the man fled westbound through the yards of the houses on the north side of Dickinson Street. Based upon this information, Officer Alcala believed that the suspect was probably somewhere in the yards between Boston Street and Dickinson Street. Officer Alcala drove west on Dickinson Street in order to circle around the block back to Boston Street.

At or about the time that Officer Begeman began searching on foot, Thomas was outside of her house located at 1124 Boston Street. Thomas, who is 4'11" and weighs approximately 120 pounds, was wearing a dark blue "FUBU" brand insulated ski jacket with a red and white stripe running down each arm, a dark blue knit winter cap, gray sweat pants, insulated ski gloves, and insulated rubber boots. Thomas was also wearing lipstick. Thomas had left her house to go to her parents' house, located a few houses down the street. Before leaving, Thomas walked to the fence around her back yard to say good morning to her dogs. She then got into her car, but changed her mind and decided to walk. As Thomas was walking down her driveway toward the front of the

3

house, she heard her dogs begin to bark. Thomas walked to the fence to find out why the dogs were barking, but she did not see anyone.

As Officer Begeman was making his way through the back yards, he saw a dog on the inside of a fence between a house and a garage and noticed a person on the other side of the fence in a crouching position. (Begeman Dep. at 84-85.) The person (who turned out to be Thomas) was facing the dog, apparently in a crouching position, and gesturing toward the dog as if trying to keep it from barking. (Id. at 85.) The person moved to the left, out of sight, and appeared to maintain a crouching position. (Id. at 85-86.) Given his knowledge that the suspect might be hiding in the area, Officer Begeman thought it suspicious that this person was crouching and apparently trying to quiet a dog. (Id. at 89.) Officer Begeman could not tell how tall the person was, and he knew that the coat that the person was wearing did not appear to be similar to a Chiefs jacket. (Id. at 91.) He saw that the person was black, but he could not tell whether the person was male or female. (Id. at 86, 88.) Based upon the information that he had, Officer Begeman concluded that the person he saw crouching down could be the person that he was trying to find. (Id. at 92-93.) Officer Begeman saw a patrol car drive by on Boston Street and radioed for the officer to check out the person at the yellow house with the brown trim on the south side of Boston Street (1124 Boston Street). The officer in the patrol car was Officer Alcala.

Officer Alcala backed his car up toward 1124 Boston Street and saw the person in the driveway. Officer Alcala saw the person turn around and start to walk toward the back of the house behind a car. (Alcala Dep. at 31.) Officer Alcala concluded that the person, who was walking, was trying to get away. (Id.) In reality, Officer Alcala saw Thomas apparently as she was walking back to see why her dogs were barking. Officer Alcala left his patrol car and ran toward Thomas, shouting, "police," and commanding Thomas to get down on the ground. (Alcala Dep. at 32;

4

Thomas Dep. at 62-63.) Thomas, unaware of the situation, put her hands up and asked what was going on, but Officer Alcala kept yelling at Thomas to get down. (Thomas Dep. at 63.) At that point, Officer Alcala was about fifteen feet from Thomas and could see her face and her hands. (Alcala Dep. at 35.) Thomas started to get down on one knee, as instructed, but, according to Thomas, Officer Alcala grabbed Thomas' hand, forced her to the ground, and began to handcuff her. (Id. at 63.) As Officer Alcala placed the handcuffs on Thomas, he realized that she was not "the five foot eight tall suspect we were looking for" because her wrists were small and he realized that she was a female. (Alcala Dep. at 45-46.)

Thomas' version of events after that time differs slightly from the officers' version. According to Thomas, by that time, Officer Begeman was on the scene and began asking Thomas why she was ducking down by the house. Thomas responded that she lived there. (Thomas Dep. at 63.) During this exchange, Officer Alcala was putting pressure on Thomas' back in order to handcuff her. (Id. at 63-64.) Officer Begeman asked Thomas if she had any identification, and Thomas told them that she had a license in the pocket of her jacket . Officer Alcala searched Thomas' right pocket first, but found only a pocket knife, at which point Officer Begeman stated, "yes she's definitely up to something." (Id. at 64.) Officer Alcala searched the other pocket and found Thomas' wallet that contained her license. The officers then stood Thomas up against her car, patted her down, and asked her if she had any warrants out for her arrest. Thomas responded that there were none. (Id. at 64.) According to Officers Alcala and Begeman, Officer Alcala had already handcuffed Thomas, located her identification, stood her up, and patted her down by the time Officer Begeman arrived on the scene. (Alcala Dep. at 59; Begeman Dep. at 103-05.) In any event, there is no dispute that Officer Alcala did not look at the address on Thomas' license in order to verify her story that she lived at 1124 Boston Street. (Alcala Dep. at 55.) Nor is there any dispute that when

5

Officer Begeman did arrive on the scene, both officers concurred that Thomas did not fit the description of the suspect. (Begeman Dep. at 105-06.) However, the officers did not release Thomas from the handcuffs, but continued to detain her based upon the suspicious conduct they observed (crouching down) until they could discuss the situation with Officer Huffman, who was on his way from Walgreens. (Id. at 106.) After conferring with Officer Huffman, Officers Alcala and Begeman placed Thomas, who was still in handcuffs, in the back of the patrol car while they ran her license through the computer to verify her identity. Officer Alcala completed the computer check, which lasted for about one minute, and verified that Thomas lived at 1124 Boston Street. At that point, the officers took Thomas out of the patrol car and removed the handcuffs. They then explained to Thomas that they were looking for a male who robbed the Walgreens. Thomas pointed out that she was a woman. (Thomas Dep. at 65.)

## II. Summary Judgment Standard

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56. Material facts are facts which are defined by substantive law and are necessary to apply the law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. Id.

The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Agristor Financial Corp. v. Van Sickle, 967 F.2d 233, 236 (6th Cir. 1992)(quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986)).

### III.  Discussion

As mentioned above, Thomas alleges that Officers Alcala and Begeman seized her and used excessive force in violation of the Fourth Amendment and that they violated her right to equal protection based upon her race in violation of the Fourteenth Amendment.  Defendants contend that they are entitled to summary judgment on Thomas' § 1983 claims because: (1) the officers had a reasonable, articulable suspicion required to support a Terry investigative detention of Thomas; (2) the evidence cannot support a reasonable inference that the officers' use of force in detaining Thomas was unreasonable; (3) there is insufficient evidence to show that the officers violated Thomas' equal protection rights; (4) the officers are entitled to qualified immunity; and (5) Thomas cannot establish municipal liability against the City for failure to train and supervise its police officers.

**A.     Existence of a Reasonable Articulable Suspicion to Support an Investigative Detention**

The Fourth Amendment preserves the right of citizens "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.  A person is seized "where there is an application of physical force, however slight, or submission to an officer's show of authority to restrain the suspect's liberty." United States v. Barker, No. 01-6239, 2003 WL 21259678, at *4 (6th Cir. May 27, 2003).  Although a seizure by the police must generally be supported by probable cause, see Michigan v. Summers, 452 U.S. 692, 697, 101 S. Ct. 2587, 2592 (1981), in Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868 (1968), and as refined in subsequent cases, including Adams v. Williams, 407 U.S. 143, 92 S. Ct. 1921 (1972), the Supreme Court created a narrow exception which permits police officers to make a brief and limited investigative detention of persons suspected of criminal wrongdoing.  Under Terry, "the police can stop and briefly detain

a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." United States v. Sokolow, 490 U.S. 1, 7, 109 S. Ct. 1581, 1585 (1989) (quoting Terry).  An officer's reasonable suspicion may be based upon his own observations or the collective knowledge or information from other officers.  See United States v. Braggs, 23 F.3d 1047, 1049 (6th Cir. 1994).  An officer's "hunch" cannot justify a stop, but "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard."  United States v. Arvizu, 534 U.S. 266, 274, 122 S. Ct. 744, 751 (2002).  In Arvizu, the Supreme Court reaffirmed the "totality of the circumstances" as the proper measure of whether a police officer had a "particularized and objective" basis for suspecting legal wrongdoing. Id. at 273, 122 S. Ct. at 750.  The Court emphasized that in reviewing the grounds for a detention, a court should not consider individual factors in isolation from one another, but instead should consider them as a whole, giving "due weight" to the inferences drawn by the officer based upon his experience and training.  Id. at 274-76, 122 S. Ct. at 751-52; see also United States v. Smith, 263 F.3d 571, 588 (6th Cir. 2001).  In other words, a court "must determine whether the individual factors, taken as a whole, give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately." United States v. Smith, 263 F.3d 571, 588 (6th Cir. 2001); see also United States v. Townsend, 305 F.3d 537, 542 (6th Cir. 2002) ("We are charged to determine whether the *combination of factors* considered by the officer is sufficient for reasonable suspicion.").  Even if the officer has a proper basis to stop an individual, a court must also examine "whether the degree of intrusion . . . was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their

8

suspicions and the surrounding circumstances." United States v. Davis, 430 F.3d 345, 354 (6th Cir. 2005) (internal quotations omitted).

The facts and circumstances known to Officers Alcala and Begeman were that the suspect in the Walgreens theft: (1) was identified as a black male, approximately 5'9" tall and weighing between 180 to 200 pounds; (2) was wearing a red jacket bearing some indication, such as a name or a logo, that it was a "Chiefs" jacket;[1] a gray stocking cap; and blue jeans; and (3) was possibly hiding in the area between Boston Street to the north, Dickinson Street to the south, Silver Avenue to the west, and Kalamazoo Avenue to the east.  In addition, Officer Begeman saw an individual (who turned out to be Thomas) in the area where the suspect was believed to be hiding crouching down and apparently trying to keep a dog from barking, although the individual's clothing did not match the suspect's clothing in any respect, including the absence of any indication that the individual's jacket was a "Chief's" jacket.  Finally, Officer Alcala testified that Thomas' turning around in the driveway and walking towards the back of the house behind a car was consistent with conduct by other people that have fled from him in the past, although there is no evidence that Thomas walked or ran away from Officer Alcala when he approached her, and Officer Alcala admitted that Thomas stood facing him with her hands up when he did so.  (Alcala Dep. at 36.)

The facts, which are not in dispute, show that any reasonable suspicion the officers may have had, if there was a reasonable suspicion, was short-lived and dissipated as soon as Officer Alcala approached Thomas in her driveway.  Thomas testified that as Officer Alcala approached her, she

---

[1] The fact that the witness described the jacket as a "Chiefs" jacket suggests that the witness observed some specific identifier besides the color red.  Other teams that use red include, to name a few, the Detroit Red Wings, the Cincinnati Reds, and the Indiana Hoosiers, yet, the witness did not identify the jacket with those teams.

9

asked him what was going on.[2] Officer Alcala should have known immediately from Thomas' voice that Thomas was a female and thus not the suspect.[3] Moreover, Officer Alcala, who is 5' 6" tall, (id. at 36-37), could have easily determined by sight that Thomas, at 4'11" and seven inches shorter than Officer Alcala, was not the suspect. Even allowing for the "heat of the moment" and an innocent failure to appreciate the obvious, by his own admission, Officer Alcala knew that Thomas was a female and, hence, not the suspect, when he handcuffed her. Finally, by the time Officer Begeman appeared on the scene, both officers knew that Thomas could not be the person that committed the alleged theft at the Walgreens store because Delauter, the witness, reported that the suspect was a male.

Defendants attempt to justify the detention on several grounds. First, they contend that the investigative stop and detention was reasonable under Terry because it lasted only about three minutes. This argument ignores well-established law that any detention, even for a few seconds, must be supported by a reasonable suspicion. See Florida v. Royer, 460 U.S. 491, 498, 103 S. Ct. 1319, 1324 (1983) (noting that a person "may not be detained even momentarily without reasonable, objective grounds for doing so"); United States v. Tehrani, 49 F.3d 54, 58 (2d Cir. 1995) (stating that investigative "detentions, no matter how brief, must be founded upon a reasonable suspicion supported by articulable facts that criminal activity may be afoot") (internal quotations omitted). Second, Defendants suggest that the detention was reasonable because they detained Thomas only long enough "to verify her identity and to dispel their reasonable suspicion that she might be somehow involved in the incident they were investigating." This argument fails because, as noted

---

[2] Officer Alcala testified that he does not remember whether Thomas said anything, but admits that it is possible that she did. (Alcala Dep. at 35.)

[3] There is no evidence that Thomas speaks in a masculine voice.

10

above, Officer Alcala should have known almost immediately upon approaching Thomas that she was not the suspect and not connected to any criminal activity he was investigating because she was a female. In addition, Defendants' argument lacks merit because there is no evidence that more than one person was involved in the crime, and any suspicion that such was the case would have been nothing more than a naked hunch. Third, Defendants suggest, although not explicitly, that because they had a reasonable suspicion when Officer Alcala first approached Thomas, they were justified in continuing to detain Thomas even after they knew that she was not the person they were seeking. This argument fails because "an investigative stop must cease once reasonable suspicion or probable cause dissipates," United States v. Watts, 7 F.3d 122, 126 (8th Cir. 1993), as it did here when Officer Alcala discovered that Thomas was a female. Finally, Defendants suggest that the detention was reasonable, even if nothing about Thomas' appearance (except her race) matched the description of the suspect, because Delauter's identification might not have been entirely accurate. Defendants cite no law for this proposition, but even allowing for some degree of eyewitness discrepancy to factor into the reasonable suspicion calculus, to apply it in this case, where race is the only characteristic consistent with the description of the suspect, would essentially amount to excising the Fourth Amendment from the Constitution.

**B.    Excessive Force**

Defendants also argue that they are entitled to summary judgment on Thomas' excessive force claim. Thomas' excessive force claim must be analyzed under the Fourth Amendment's standard of objective reasonableness. Graham v. Connor, 490 U.S. 386, 395-96, 109 S. Ct. 1865, 1871 (1989). This standard must be applied in light of the reality that "police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly

11

evolving." Id. at 397, 109 S. Ct. at 1872.  Thus, "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. at 396, 109 S. Ct. at 1872.  In determining whether an officer's actions were reasonable, a court must examine the specific facts of the case.  Kostrzewa v. City of Troy, 247 F.3d 633, 639 (2001)(citing Graham).  Factors that bear on the issue are: (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officers or others; and (3) whether the suspect is cooperating or is actively resisting arrest or attempting to flee.  Id.

Applying these principles to the evidence, construed in favor of Thomas, the Court concludes that Thomas has presented sufficient evidence to establish an excessive force claim.  First, the crime the officers were investigating was a theft of a "stop smoking" product, perhaps gum, from Walgreens.  This was not a severe offense and there was no indication that the police had any information that the perpetrator was armed or used threats or violence during the crime.  Second, the evidence shows that Thomas was compliant with Officer Alcala's orders and did not act in a threatening manner.  In fact, except for the pocket knife in her jacket (of which the officers were not aware), there is no evidence that Thomas possessed any weapon.  Finally, the evidence, which is not in dispute, shows that Thomas did not attempt to flee.  Based upon this evidence, a reasonable jury could conclude that Defendants' actions were objectively unreasonable.  Moreover, given the Court's conclusion above that any reasonable suspicion dissipated almost immediately after Officer Alcala approached Thomas in her driveway, a reasonable jury could conclude that even the use of handcuffs in detaining Thomas constituted excessive force and, thus, violated her Fourth Amendment rights. See Bennett v. City of Eastpointe, 410 F.3d 810, 837 (6th Cir. 2005) (holding that police officers violated the plaintiffs' Fourth Amendment rights by handcuffing them when the officers did not have

a reasonable suspicion that the plaintiffs were armed and dangerous and they did not attempt to flee or do anything else that would warrant the use of force).

**C.      Equal Protection**

The Equal Protection Clause requires government officials to treat similarly situated individuals in a similar manner. See U.S. Const. amend. XIV. In order to establish a violation of the Equal Protection Clause, a plaintiff must prove that a racially discriminatory intent or purpose was a factor that influenced the governmental actor's decision or action. See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 265-66, 97 S. Ct. 555, 563 (1977).

> A person bringing an action under the Equal Protection Clause must show intentional discrimination against him because of his membership in a particular class, not merely that he was treated unfairly as an individual. "[T]he decision maker [must have] selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."

Huebschen v. Dep't of Health & Soc. Servs., 716 F.2d 1167, 1171 (7th Cir. 1983) (quoting Personnel Adm'r v. Feeney, 442 U.S. 256, 279, 99 S. Ct. 2282, 2296 (1979)). A plaintiff may show that the decisionmaker acted with a discriminatory purpose by introducing evidence that similarly situated individuals of a different race were treated differently. See Farm Labor Org. Comm. v. Ohio State Highway Patrol, 308 F.3d 523, 534 (6th Cir. 2002). "A claimant can demonstrate discriminatory effect by naming a similarly situated individual who was [treated differently] or through the use of statistical evidence or other evidence which 'address[es] the crucial question of whether one class is being treated differently from another class that is otherwise similarly situated.'" Id. (quoting Chavez v. Ill. State Police, 251 F.3d 612, 638 (7th Cir. 2001)).

Thomas contends that she has presented sufficient evidence to show that Officers Alcala and Begeman acted with discriminatory intent. In particular, Thomas asserts that because her clothing

13

and physical characteristics differed from the suspect's clothing and physical characteristics in all respects, except one – race – there remains a question of fact as to whether Thomas' race was the sole identifier used by the officers to detain her and, if such is the case, this use of race alone to detain her violated Thomas' right to equal protection under the United States Constitution. The Court disagrees. Contrary to Thomas' suggestion, the officers were not prohibited from using race to identify the suspect in the alleged crime. Because the description the officers had received indicated that the suspect was black, they were entitled to take race into consideration in the course of searching for the suspect. Thomas' attempt to characterize this case as one of selective enforcement based upon race fails because such cases generally entail enforcement of a facially neutral criminal law to persons of a particular race but not to persons of another race. See Gardenhire v. Schubert, 205 F.3d 303, 319 (6th Cir. 2000). This case does not concern the enforcement of a facially neutral criminal law, but rather the search for a suspect described as being black. Although Officers Alcala and Begeman should have realized that Thomas was not the suspect, there is no evidence that their actions were motivated by anything other than the fact that they knew the suspect they were searching for was black. Moreover, in contrast to Farm Labor Organizing Committee, upon which Thomas relies, there is no evidence that Officers Alcala and Begeman acted with a discriminatory purpose. The plaintiffs in Farm Labor Organizing Committee presented substantial evidence, including the testimony from two Ohio State Troopers that they would have called the Border Patrol in certain situations involving Hispanics but would not have done so if those situations involved white motorists. See Farm Labor Org. Comm., 308 F.3d at 535. In this case, Thomas has failed to present any evidence at all to show that the officers would have

14

treated non-black persons differently. Accordingly, Defendants are entitled to summary judgment on the Equal Protection claim.

**D.     Qualified Immunity**

Officers Alcala and Begeman also argue that they are entitled to summary judgment on Thomas' Fourth Amendment claims because they are entitled to qualified immunity. Qualified immunity shields "[g]overnment officials performing discretionary functions" from liability for civil damages "as long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Poe v. Haydon, 853 F.2d 418, 423 (6th Cir. 1988)(quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2735 (1982)). A law enforcement officer is entitled to qualified immunity if "a reasonable officer could have believed [his actions] to be lawful, in light of clearly established law and the information the [] officer[] possessed." Anderson v. Creighton, 483 U.S. 635, 641, 107 S. Ct. 3034, 3040 (1987). A plaintiff who seeks to hold an official protected by qualified immunity liable must: (1) identify "a clearly established right alleged to have been violated"; and (2) establish that "a reasonable police officer in [the] defendant[']s position should have known that the conduct at issue was undertaken in violation of that right." Johnson v. Estate of Laccheo, 935 F.2d 109, 111 (6th Cir. 1991); see also Watkins v. City of Southfield, 221 F.3d 883, 887 (6th Cir. 2000).

The Court has already determined that Thomas has not only alleged, but also presented evidence to prove, that Officers Alcala and Begeman violated her Fourth Amendment rights by detaining (or continuing to detain) her without a reasonable suspicion to do so and by using an unreasonable amount of force. Thus, the only issue is whether Thomas' Fourth Amendment rights were clearly established. To be clearly established, "the law must be clear in regard to the official's

15

particular actions in the particular situation." Long v. Norris, 929 F.2d 1111, 1114 (6th Cir. 1991). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing" violates federal law. Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039 (1987). While replication of the official's specific conduct is not required to overcome qualified immunity, "'pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law *in the circumstances*.'" Saylor v. Bd. of Educ., 118 F.3d 507, 515 (6th Cir. 1997)(quoting Lassiter v. Ala. A & M Univ., 28 F.3d 1146, 1150 (11th Cir. 1994)(en banc)).

In light of the Court's conclusion that Officer Alcala should have known almost immediately that Thomas was not the suspect, and given Defendants' own admissions that they knew that Thomas was a female but nonetheless continued to detain her in handcuffs, the Court concludes that Defendants are not entitled to qualified immunity because no reasonable police officer could conclude that such actions were proper under the Fourth Amendment. See Bennett, 410 F.3d at 840-41. Likewise, Defendants are not entitled to qualified immunity on the excessive force claim. It is clearly established that under the Fourth Amendment, an individual has a right to be free from the excessive use of force during an arrest. Graham, 490 U.S. at 395-96, 109 S. Ct. at 1871. Because the evidence in this case is sufficient to establish that Defendants' use of force was unreasonable, Defendants are not entitled to qualified immunity. See Minchella v. Bauman, No. 02-1454, 2003 U.S. App. LEXIS 16844 (6th Cir. Aug. 13, 2003).

**E.     Municipal Liability**

Defendants also argue that the City is entitled to summary judgment on Thomas' failure to train and supervise claim because Thomas cannot show that the City's training program was

inadequate or that the City had a policy or custom of providing inadequate training that caused the alleged constitutional violations.  Although Thomas suggests that Captain Whitman's testimony might be indicative of an unwritten municipal policy that resulted in her arrest, she concedes that she is unable to establish a policy and "agree[s] that a granting of the City of Grand Rapids Motion on Count II would be appropriate."  (Pl.'s Br. Opp'n at 23.)  Accordingly, in light of Thomas' admitted failure to present evidence of a policy or custom, the Court will grant summary judgment to the City on Thomas' municipal liability claim in Count II.

**F.     State Law Claims**

As part of their motion, Defendants request that the Court dismiss Thomas' state law claims. However, this request is predicated upon the assumption that all federal claims will be dismissed. Because some federal claims remain and the state law claims are closely related to the federal claims, the Court will continue to exercise jurisdiction over the state law claims.

### IV.  Conclusion

For the foregoing reasons, the Court will grant in part and deny in part Defendants' motion for summary judgment.  The motion will be granted with regard to Thomas' equal protection claim and municipal liability claim.  The motion will be denied with regard to Thomas' Fourth Amendment claims and the issue of qualified immunity.

An Order consistent with this Opinion will be entered.


Dated: January 5, 2006                                         /s/ Gordon J. Quist
                                                              GORDON J. QUIST
                                                         UNITED STATES DISTRICT JUDGE